**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| CHRISTOPHER ROONEY, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 18-10670 |
| v. | : | **OPINION** |
| NVR, INC., et al., | : | |
| Defendants. | : | |

This matter comes before the Court on Defendant's Motion for Summary Judgment [Dkt. No. 18] and Motion to Strike Plaintiff's Response to Defendant's Statement of Facts and Plaintiff's Statement of Facts [Dkt. No. 25]. The Court has considered the parties' written submissions and the arguments advanced orally at the hearing held on February 6, 2020. For the reasons below, the Court will grant Defendant's Motion for Summary Judgment; and grant in part and deny in part Defendant's Motion to Strike.

I.    <u>Background</u>

### A. **Factual Background**[1]

---

[1] Defendant filed a Motion to Strike Plaintiff's Response to Defendant's Statement of Facts [Dkt. No. 22-1], and Plaintiff's Statement of Facts [Dkt. No. 22-2]. Defendant argues that Plaintiff's response fails to properly support responses to Defendant's statement with citations to the record and "is replete with impermissible legal argument." <u>See</u> [Dkt. No. 25-3]. Defendant further moves to strike Plaintiff's own statement of facts for similar reasons, pointing to numerous paragraphs where Plaintiff allegedly misrepresents or mischaracterizes the record. (<u>Id.</u>) The Court agrees with Defendant to an extent. First, there are instances where Plaintiff's responsive statement of material facts fails to dispute a supported statement, but rather "asserts arguments and legal analysis, not facts" or further fails to provide proper citation to the record. <u>Barker v. Our Lady of Mount Carmel Sch.</u>, No. CV 12-4308, 2016 WL 4571388, at *1 n.1 (D.N.J. Sept. 1, 2016). The Court simply disregards any such improperly disputed facts. <u>See</u> <u>Sprint Spectrum L.P. v. Zoning Bd. of Adjustment of Borough of Paramus, N.J.</u>, No. CIV.A. 09-4940, 2010 WL 4868218, at *18 (D.N.J. Nov. 22, 2010) ("[T]he purpose of these statements [of fact] is to narrow the issues before the Court, L. Civ. R. 56.1, comment 2, and arguments inserted

Christopher Rooney ("Rooney" or "Plaintiff") was an employee with Defendant, NVR, Inc. ("Defendant" or "NVR") at their New Jersey manufacturing plant, beginning January 2, 2017. [Dkt. No. 22-2 ¶ 1]. NVR "specializes in producing pre-fabricate homes." [Dkt. No. 18-4 ¶ 1]. It initially hired Plaintiff as a Driver Helper, "doing sheathing, framing, and putting on wheels," but shortly after starting, he was transitioned to the panel department. (Id. at ¶ 2; Dkt. No. 22-2 ¶ 2). In that department, Mike Bachman ("Bachman") acted as Plaintiff's direct supervisor, but Plaintiff also received supervision from Eli Cuesta. (Id. at ¶ 3). At the plant, Bachman reported to, Brandon Mandia and Tom Green ("Green"), (Id.), who reported to Mark Harris. (Id. at ¶ 5). Green acted as a manager and "as worker's compensation liaison for employees who become injured on the job." (Id. at ¶ 4). In addition, Green "handled "some human resources and safety functions for the plant." (Id.).

NVR completes employee performance reviews, which Bachman filled out. (Id. at 13). "In NVR's ratings system, employees receive color and number-coded rankings. Red numbers (0-3) indicate unacceptable performance; yellow numbers (4-6) indicate marginal performance; and green numbers indicate good performance (7-9), excellent performance (9-12), and outstanding performance (13-15)." (Id.).

After Plaintiff's first thirty days with NVR, he received a marginal rating review of 6.86. (Id. at ¶ 14). His review also included comments about his performance, which stated "coming back from lunch/break late, given warning and fixed since then. Watch work pace. Improving since working with Raul"—who Plaintiff worked with in the Panel

therein accomplish the opposite."). Similarly, the Court will ignore statements in Plaintiff's statement of material facts that are immaterial or unsupported.

Department. (Pl. Dep. 167:5-25). Bachman testified that when an employee receives a marginal performance review, there is a conversation with the employee to discuss expectations and "exactly what areas they're falling behind in." (Bachman Dep. 14:24). "Mandia and Bachman met with [Plaintiff] and provided coaching about his work performance." [Dkt. No. 18-4 ¶ 15]; (Bachman Dep. 55:7-12.). In March 2017, Plaintiff received a "good" rating of "7" on his 60-day performance review, with no further comments. [Dkt. No. 22-2 ¶ 4].

NVR employees also receive weekly reviews in categories such as "Job Knowledge," "Teamwork," "5S" (Safety), "Quality," and "Work Pace." [Def. at ¶ 19]. Plaintiff's weekly reviews from January 2017 through March 2017 produced the following averages: Job Knowledge: Average of 6.67, or "Marginal"; Teamwork: Average of 5.11, or "Marginal"; 5S: Average of 5.88, or "Marginal"; Quality: Average of 7.16, or "Good"; and Work Pace: Average of 4.22, or "Marginal. (Id. at ¶ 20).

In May 2017, NVR transferred Plaintiff for the second time, now to the loading pit as a Loader and Bander. (Id. at ¶ 22). Defendant's expert reported that "[t]he loading pit is a 5,000 square foot area with three bays for semitrailers where workers tie (i.e. 'band' or 'strap') bundles (i.e. 'bunks' or 'packs') of walls together and load them onto semitrailers before they leave the plant." (Id. at ¶ 24). In his new role, Plaintiff's physical responsibilities primarily included "banding" or "strapping;" he occasionally performed Prepping, Loading, and Finishing. (Id. at ¶ 25). His administrative tasks included calling trailers in and out and inputting information into a computer. (Id. at ¶ 26). The loading pit maintains a team environment, and Plaintiff worked closely with certain co-workers. (Id. at ¶¶ 28-29). Plaintiff described his job as always being physical, "it was always movement, always activity." (Pl. Dep. 61:12-18).

On May 31, 2017, Plaintiff was injured while working in the loading pit. [Dkt. No. 18-4 ¶ 32]. The trailers were wet from rain when Plaintiff was putting the bundle in the bulk. He had to straddle the pit when it nudged out of place and his foot slipped. He grabbed on to the buddle to stop a fall and "heard a pop, pop, crack." (Pl. Dep. 88-90). Plaintiff testified that he could not put weight on his right knee or bend it. "Green helped [Plaintiff] to the cafeteria, got him ice, filled out an incident report," and "[Plaintiff] sat in the cafeteria like trying to be able to walk. [He] would try to walk up and down. . . . [but] couldn't put no pressure up on it for a while." (Id. at 91:4-8; Dkt. No. 18-4 ¶ 33). Green took Plaintiff to the Doctor, Concentra, where the physician qualified Plaintiff to return to work with no restrictions on June 1, 2017. [Dkt. No. 18-4 ¶¶ 33-34]. He continued to check in with the Concentra doctor and performed PT.

 "On June 15, 2017, after a medical check-up, Rooney's physician returned him to regular duty with a restriction for no climbing stairs." (Id. at ¶ 35). At his check-up the following week, Plaintiff was diagnosed with a sprained anterior cruciate ligament ("ACL"), and returned to work with additional medical restrictions: "Wear Splint/Brace RLE - constantly - up to 8 hrs or greater per day"; "May not walk on uneven terrain"; "No climbing stairs"; "No climbing ladders"; but "Patient is able to work their entire shift[.]" (Id. at ¶ 36). On June 27, 2017, Plaintiff's doctor altered his restrictions to (1) "Wear brace[,]" and (2) "[n]o climbing stairs." (Pl. Dep. 116:7-15.). Plaintiff informed Bachman of all of his restrictions and his team was also put on notice. (Id. at 100).  He was subsequently placed on modified duty. [Dkt. No. 22-2 ¶ 18].

The loading pit area, where Plaintiff worked, has no stairs, but a ladder leads from the main floor into the truck bay, which Defendant asserts "employees use on occasion when prepping and/or finishing trailers." [Dkt. No. 18-4 ¶ 38]. Plaintiff

testified "[the ladder] is two steps, but it would have been four total if it was regular. They were two deep steps about a foot and a half long, or about two feet. It was one, by the time you touched it, your knee was to your chest." (Pl. Dep. 104:12-18).

Plaintiff's primary duties did not require taking this ladder or climbing any stairs. [Dkt. No. 18-4 ¶ 42]. Because of Plaintiff's restrictions, his supervisors told him he was no longer required to climb. (Id. at ¶ 40). Bachman further instructed Plaintiff's co-workers to assist him with job tasks when needed. Specifically, "Nguyen and Adorno were designated to provide assistance if [Plaintiff] was unable to perform a particular task, and others of Rooney's co-workers could step in to assist, if Adorno and Nguyen were unavailable." (Id. ¶ 41).

Plaintiff, however, "found it difficult to perform the job without having to go up and down the stairs into the pit." (Dkt. No. 22-2 ¶ 20). He "often" took the ladder into the pit. Although he asked for help there was only the three of them, "people were getting annoyed," or not around. (Pl. Dep. at 103, 109:7). At his deposition he stated that NVR did not "bring anyone extra over to help accommodate [his] restrictions." (Pl. Dep. 103:1-19; 109:2-7; 112:16-22; 123:8-124:14). Plaintiff also testified his supervisors "didn't say anything" when he worked outside of his restrictions. "They would just look at me and keep walking . . . and [t]hat's how I feel I was discriminated against because they weren't seeing a person with a disability. They were seeing oh, good, the numbers are going out, we are good, and just kept walking. They all knew my restrictions but never said anything to me." (Pl. Dep. 109:25-110:10.)

Plaintiff did not inform his supervisors, or anyone at NVR, that he could not stay within his restrictions during his employment. [Dkt. No. 18-4 ¶ 42]. Nor did he inform

anyone that NVR was unable to accommodate his restrictions during his employment. (Pl. Dep. 106:4-107:18; 109:15-24; Bachman Dep. 32:2-9, 37:7-13.).

Following his injury, Plaintiff had knee surgery in July 2017, for which NVR afforded him six months leave. As a result, his six-month review was postponed. [Dkt. No. 18-4 ¶¶ 44-45]. Plaintiff returned to NVR with no restrictions on January 16, 2018, but was advised to take it easy. (Id. at ¶ 46). He testified to sharing this information with Bachman. (Pl. Dep. 220:9-12). Upon return, he also received his postponed-review covering January 2017 through June 2017, which rated him at 29.35 out of 50, "unacceptable." [Dkt. No. 18-4 ¶ 48]. Bachman testified; "we worked with [Plaintiff] to try to figure out how -- we talked with Mark, talked to Tom about how to really get him back up and figure out kind of how to coach him at some point where he was going to be a good part of our team going forward." (Bachman Dep. 26:13-24).

On his first day back, Bachman "provided Rooney with one-on-one performance coaching, and offered specific coaching regarding: (1) his failure to complete tasks in a timely fashion; (2) leaving his position and being off task; (3) wasting time; and (4) failing to help other team members in the area." [Dkt. No. 18-4 ¶ 49]. He instructed the plaintiff to focus on improving his performance in these areas and on his banding duties. [Dkt. No. 18-3, Ex. P]. Bachman also instructed to "let the lead guys like John and [Gio] do the rest of the work." (Id.; Bachman Dep. 37:14-20)

Plaintiff's weekly reviews from January 16, 2018 and February 12, 2018 showed: Job Knowledge: Average of 7.00, or "Good"; Teamwork: Average of 1.40, or "Unacceptable"; 5S: Average of 5.00, or "Marginal"; Quality: Average of 6.20, or "Marginal"; Work Pace: Average of 6.00, or "Marginal." [Dkt. No. 18-4 ¶ 52]. Plaintiff was unsure as to what factors Bachman considered in his reviews, but believes that the

ratings were "skewed" because of his injury and medical leave and also a result of his line leader not liking him. (Pl. Dep. 224:8-226:1). The comments on his weekly reviews for this time stated that Plaintiff had started back from medical leave, that the department was moving well but Plaintiff was very limited in the tasks he was able/willing to perform and was distracting employees; issues coming back from break late. [Dkt. No. 22-8. Ex. G].

On February 21, 2007, Plaintiff felt pain in his stomach area, like he pulled something, but declined seeing a doctor right away. [Dkt. No. 18-4 ¶ 54]. He testified that his co-worker witnessed him bend over in pain after lifting something heavy, which he reported to a manager. (Pl. Dep. 139-140). According to Plaintiff, the next day he told Green he wanted to go to the doctors because he was still in pain. (Id. at 76:11-20). Green told Plaintiff he could take him to the doctors on Friday, but due to a conflict was ultimately unable to take him that day. He told Plaintiff to go to Concentra by himself. [Dkt. No. 18-4 ¶ 56]. Plaintiff proceeded to see the doctor, where he was diagnosed with an umbilical hernia. (Id.).

At his deposition, Plaintiff stated that he then called headquarters, on February 23, 2018. (Pl. Dep. 245:12-25). Corporate referred Plaintiff to a Human Resources Manager, who Plaintiff contacted "stating that he was recently injured and had a few questions." [Dkt. No. 18-4 ¶ 60]. NVR does not know why Plaintiff contacted this particular HR department because they have no relation to the New Jersey plant Plaintiff worked for. Plaintiff claims that he wanted to make a complaint about Green and was trying to contact the corporate HR. (Id. at ¶ 60, and Pl. Resp. ¶ 60). "[HR] forwarded the information that Rooney had conveyed to Michelle Dorsch ("Dorsch"),

the HR Manager for [his] plant. Dorsch then emailed Green and Harris, suggesting they reach out to Rooney to find out what questions he had." (Id. at ¶ 61).

Plaintiff met with Green and Harris where he expressed that he felt like he was not a priority, like he was getting "pushed around." (Pl. Dep. 247:6-12). Plaintiff stated that he still did not have a workers compensation number for his accident, which his doctor needed for a CT. (Id. at 247:13-25). Plaintiff also told them Green was biased against him and referred to a comment Green made—asking Plaintiff "are you sure you didn't do this [get injured] at the gym lifting weights." (Id. at 248:1-14). In response, Harris told Plaintiff he understood and that "our main priority here is you guys, your safety." (Id. at 248; 21-15).

Following this second injury, Plaintiff's Doctor certified him to return to work with the following new restrictions, which Plaintiff conveyed to NVR: "May lift up to 10 pounds occasionally up to three hours a day, may push or pull up to 10 pounds occasionally up to three hours a day, and patient is able to work their entire shift." [Dkt. No. 18-4 ¶¶ 64-65]. Due to his restrictions, Plaintiff and Green agreed that Plaintiff would only perform banding duties. According to Plaintiff, banding was like "individual framing for the bundle, to go pick up by a three-ton crane and put it on the trailer." It required strapping stacks of walls together with nylon straps using a ratchet tensioner. (Id. at ¶ 25). Plaintiff described "[pushing] all your weight as strong as you possibly humanly can before the band would snap." (Pl. Dep. 46:7-21). Plaintiff's team was instructed to help him with tasks he could not perform due to restrictions. [Dkt. No. 18-4 ¶ 68].

Plaintiff still believed that he could not strap[2] but did not tell Green strapping was not within his restrictions. He testified that strapping required more than 10 pounds of force, that that fact was simple knowledge. He also testified, however, that he did not know whether Green did know that. Plaintiff further testified that he would not have been able to operate the crane with his restriction and that, in fact, there was no job that he could perform at work with his hernia restrictions. (Pl. Dep. at 158).

According to Defendant, come February 2018, "[Plaintiff] displayed a poor attitude with his supervisor, and he frequently walked off the job without explaining his absence." [Dkt. No. 18-4 ¶ 89]. Harris testified NVR was "getting reports of Plaintiff not working, distracting other employees." (Harris Dep. 59:15-20, 65:12-19). Plaintiff's weekly reviews for February 19, 2018 to March 5, 2019, Plaintiff received the following average ratings: Job Knowledge: Average of 7.00, or "Good"; Teamwork: Average of 3.00, or "Unacceptable"; 5S: Average of 2.67, or "Unacceptable"; Quality: Average of 7.67, or "Good"; Work Pace: Average of 4.67, or "Marginal". [Dkt. No. 18-4 ¶ 90]. Plaintiff's last performance evaluation was March 13, 2018, he received a rating of 28.25, or "unacceptable". [Dkt. No. 18-3, Ex. Q.].

The same day as his last review, NVR terminated Plaintiff's employment, effective March 14, 2018. [Dkt. No. 18-4 ¶ 97]. Bachman and his superior, Brandon Mandia, spoke with Plaintiff in person and expressed that the reason for his termination was performance. Bachman had originally proposed Plaintiff's termination to Green, which they decided to discuss with Harris. (Harris Dep. 64:10-19.) Bachman testified that he was not aware of any complaint Plaintiff may have made against Green when he decided

---

[2] Strapping and banding are used interchangeably.

to terminate him. (Bachman Dep. 36:13-19.). Plaintiff, however, felt that he was terminated because of his injury. (Pl. Dep. 227:18-25).

According to Bachman, "[Plaintiff's] injury was not a factor at all. His termination was entirely about his performance, his attitude, and his unwillingness and/or inability to get along with his supervisor." (Id. at 91:2-9.). Defendant states that it "did not seek to fill Rooney's position, and instead, the existing team continued its work without him." Ultimately, an NVR employee, Adorno, assumed Plaintiff's former duties while continuing to serve in his own role in the loading pit after returning from a medical leave. [Dkt. No. 18-4 ¶¶ 99-101].

B. **Procedural Background**

Plaintiff filed a Complaint with the Superior Court of New Jersey Law Division, Burlington County against NVR, and John Does, for violations of the New Jersey Law Against Discrimination ("NJLAD") for Disability Discrimination (Count I), Violations of the NJLAD for failure to provide a reasonable accommodation (Count II), and Wrongful termination in violation of public Policy (Count III). Defendants removed the action to this Court on June 15, 2018. NVR filed a Motion for Summary Judgment on August 23, 2019. Plaintiff filed a brief in opposition to that motion [Dkt. No. 23], to which Defendants replied [Dkt. No. 24] and filed a Motion to strike Plaintiff's Response to Defendants Statement of Facts and Plaintiff's Statement of Facts [Dkt. No. 25]. The Court heard Oral Argument on those motions at a hearing held on February 6, 2020.

II.     Summary Judgment Standard

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. Pearson v. Component Tech.

Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256–57. Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. Credibility determinations are the province of the finder of fact. <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

III.  <u>Analysis</u>

**A.  Count One: Disability Discrimination in Violation of the NJLAD**

Count One of the Complaint alleges that Defendant discriminated against Plaintiff by terminating him for his disability in violation of the NJLAD. Defendants argue that Count I fails as a matter of law because Plaintiff cannot establish a <u>prima facie</u> case of discrimination, and even if Plaintiff succeeded in his <u>prima facie</u> case, he cannot show that Defendant's legitimate non-discriminatory reason for his termination—poor performance—was pretext.

Analysis of claims made pursuant to the NJLAD generally follow the analysis of Title VII claims. <u>Schurr v. Resorts Int'l Hotel, Inc.</u>, 196 F.3d 486, 498 (3d Cir. 1999). Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. The framework announced in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), governs Title VII claims, and, by extension, claims under the NJLAD.

Under the <u>McDonnell Douglas</u> paradigm, an employee must first establish by a preponderance of the evidence a <u>prima facie</u> claim of discriminatory discharge under the NJLAD. <u>Muller v. Exxon Research & Eng'g Co.</u>, 786 A.2d 143 (N.J. Super. Ct. App. Div. 2001). Then, the burden shifts to the employer to produce evidence demonstrating that the termination was "for a legitimate, nondiscriminatory reason. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). If the defendant meets this burden, the presumption of discrimination drops from the case, and the burden shifts to the plaintiff to prove by a preponderance of the evidence that the stated reason was pretextual. <u>Id.</u> at 260; <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993).

In evaluating employment cases, the task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory purpose. <u>Ezold v. Wolf, Block, Schorr & Solis–Cohen</u>, 983 F.2d 509, 525–27 (3d Cir. 1992). Thus, to establish pretext, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the . . . plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employers' proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer' did not act for [the asserted] nondiscriminatory reasons." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994) (internal citations omitted); <u>Romano v. Brown & Williamson Tobacco Corp.</u>, 665 A.2d 1139, 1143–144 (citing <u>Fuentes</u>, 32 F.3d at 764–65).

*1. Prima Facie Case of Discrimination Under the NJLAD*

To establish a <u>prima facie</u> case of disability discrimination, Plaintiff must show (1) that he was disabled; (2) that he was otherwise qualified to perform the essential functions of the job, with or without the accommodation by the employer, and was performing at a level that met the employer's expectations; (3) that he nevertheless was fired; and (4) that the employer sought someone to perform the same work after he left. <u>Muller v. Exxon Research & Eng'g Co.</u>, 786 A.2d 143 (N.J. Super. Ct. App. Div. 2001) (citing <u>Clowes v. Terminix Int'l, Inc.</u>, 538 A.2d 794 (N.J. 1988)).

In this case, there is no dispute that Plaintiff had a disability or that NVR ultimately terminated his employment. Defendant submits, however, that Plaintiff cannot demonstrate element 2—that he met NVR's performance expectations or that he was a qualified individual able to perform the essential functions of his job with or without an accommodation—or element 4—that NVR sought anyone to replace him after he left. [Dkt. No. 18-5 at 7-9].

　　a. <u>Whether Plaintiff has established he was otherwise qualified to perform the essential functions of his job, with or without the accommodation by NVR, and was performing at a level that met the employer's expectations.</u>

Defendant argues the record in this case is clear, that Plaintiff's job performance was "consistently inadequate," and therefore, he fails to establish that he was performing at a level that met NVR's expectations. To the contrary, Plaintiff contends that he "need only point to evidence that he was actually performing his job prior to his termination to raise an inference that [his] claim is plausible." [Dkt. No. 22 at 16 (citing <u>Andujar v. General Nutrition Corp.</u>, 2017 U.S. Dist. LEXIS 81022 (D.N.J. May 26, 2017), <u>aff'd</u> 2019 U.S. App. LEXIS 10888 (3d Cir. N.J., Apr. 12, 2019) and <u>Zive v. Stanley Roberts, Inc.</u>, 867 A.2d 1133, 1143 (N.J. 2005))].

To be sure, Plaintiff's burden to prove his <u>prima face</u> case is slight. <u>Mehta v.</u> <u>Fairleigh Dickinson Univ.</u>, 530 F. App'x 191, 196 (3d Cir. 2013). According to the New Jersey Supreme Court, the burden is met as to element two "even if a plaintiff candidly acknowledges, on his own case, that some performance issues have arisen, so long as he adduces evidence that he has, in fact, performed in the position up to the time of termination." <u>Zive</u>, 867 A.2d at 1144. Although, "simple proof of continued employment is not enough." <u>Id.</u> Evidence such as "longevity in the position at issue" or testimony that plaintiff had been working "within the title from which [he] was terminated" would be sufficient to establish this element. <u>Id.</u>

The employee in <u>Zive</u> was terminated after working from home for three months following a stroke. Subsequently, he brought suit for disability discrimination. The employer argued that the employee was failing to meet sales goals, and therefore, was not meeting performance expectations as required by the <u>prima facie</u> case. <u>Id.</u> at 1136. The employee acknowledged his failure to meet a $2.5-million-dollar goal. <u>Id.</u> at 1144. Notwithstanding, the Supreme Court of New Jersey ruled that the employee met his burden and established he was qualified and performing his job by showing that he "had significant experience as a sales executive prior to his employment with [defendant]. He had worked for [defendant] for eight years and had been actively engaged in the management and administration of [its new division]. Importantly, until the time of his stroke, [the employee] had never been told that his job was at stake." <u>Id.</u>

The court in <u>Zive</u> also recognized that the established standard for evaluating an "employer's legitimate expectations" is objective. <u>Id.</u> at 1143; <u>see</u> <u>also</u> <u>Guarneri v.</u> <u>Buckeye Pipe Line Servs. Co.</u>, 205 F. Supp. 3d 606, 615 (D.N.J. 2016) ("[T]he law applies an objective test when evaluating the 'employers' legitimate expectations' rather

than a subjective test."). "Objective evaluations can be measured and quantified and, as the <u>Weldon</u> court illustrated, do not refer to intangible criteria, such as the "quality" of an employee's work." <u>Id.</u> at 616. However, subjective evaluations—those "based on levels of broad, general terms such as "effort" "initiative" and "sense of priorities," —"are more susceptible of abuse and more likely to mask pretext." <u>Id.</u> at 615; <u>Fowle v. C & C Cola</u>, 868 F.2d 59, 64–65 (3d Cir. 1989).

Here, Defendant submits that its evaluations of Plaintiff's work performance while at NVR are objective and properly considered by this Court. These evaluations include Plaintiff's 30-day review, which was marginal [Dkt. No. 18-3, Ex. M, N]; his 60-day review, which was "Good," and his only "good" performance review while employed (<u>Id.</u>); and his six-month review, which was "unacceptable" (<u>Id.</u> at Ex. Q). Plaintiff also received weekly reviews. They contained numerical ratings as well as comments about his performance. During his first four months those comments provided: "Work to pick up pace;" "wasting a lot of time waiting;" "Counseled for failure to keep area clean;" having issues getting back to position after break;" "Making other sheather do most of the work;" "not helping out other sheathers. Lots of inactivity/talking at back of line. Coming back late from breaks." (<u>Id.</u> at Ex. O). After NVR transferred Plaintiff to the loading pit, he showed improvement in "Job Knowledge," but his " "Teamwork," "5S," and "Work Pace" ratings continued to fall. Bachman discussed with Plaintiff that he should consistently be contributing to maintain department flowing efficiently, and be on time. (<u>Id.</u> at Ex. P).  After this discussion, Plaintiff received his last review before termination for March 2018 rating his performance as "unacceptable."

Thus, Defendant submits Plaintiff fails to demonstrate that he was performing against the weight of his well-documented underperformance. [Dkt. No. 24 at 1]. To be

sure, Plaintiff does not submit evidence that his work performance was improving, or meeting "expectations." Additionally, unlike the employee in Zive, Plaintiff was not working for his employer for a significant amount of time, and does not argue that he has significant experience in the work he was performing for NVR. Instead, Plaintiff contests the objectivity of Defendant's performance evaluations. First, he argues that it is "unclear on [his] performance reviews whether a comment or rating was describing Plaintiff or the team as a whole." [Dkt. No. 22 at 18]. Second, Plaintiff contends that his Supervisor was biased against him. Indeed, Plaintiff concludes that it remains "a question of fact for the jury whether Plaintiff's performance was objectively poor, whether his injury caused his performance to suffer, or whether his supervisors' discriminatory animus against a twice-injured employee skewed his performance reviews in an overly harsh manner." [Dkt. No. 22 at 17].

The court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Under the principals set forth in Zive, at this stage, "only the plaintiff's evidence should be considered." 867 A.2d at 1144. Taking the facts in a light most favorable to Plaintiff, he had been working "within the title from which [he] was terminated," and his evaluations, while based on certain measurable objective criteria did not always apply individually to Plaintiff. Considering "the modest burden to withstand summary judgment as to the second prong of the prima facie case," the Court finds that Plaintiff in this case has met his burden, and therefore, established element two of a prima facie case for disability discrimination. Grande v. Saint Clare's Health Sys., 230 N.J. 1, 26, 164 A.3d 1030, 1044 (2017).

b. <u>Whether NVR sought someone to perform the same work as Plaintiff after he left.</u>

Although Plaintiff can demonstrate element two, the Court finds that Plaintiff fails to establish the fourth and final prong of his <u>prima facie</u> case. "The fourth prong requires proof that the 'employer sought a replacement with qualifications similar to [the employee's] own, thus demonstrating a continued need for the same services and skills.'" <u>Grande v. Saint Clare's Health Sys.</u>, 230 N.J. 1, 18, 164 A.3d 1030, 1039 (2017) (quoting <u>Bergen Commercial Bank v. Sisler</u>, 723 *A*.2d 944, 959 (N.J. 1999). This element is necessary to "allow an inference to be drawn of disparate treatment, since if the disabled employee's job was given to a nondisabled person it could be inferred that the disabled employee received the adverse job action because of his or her disability." <u>Rosenfeld v. Canon Bus. Sols., Inc.</u>, No. CIV. 09-4127, 2011 WL 4527959, at *19 (D.N.J. Sept. 26, 2011) (quoting <u>Seiden v. Marina Assocs.</u>, 718 A.2d 1230, 1234 (N.J. Super. Law. Div. 1998)) .

Here, Defendant argues that Plaintiff cannot show element four because "NVR did not seek to fill Rooney's position, and instead, the existing team continued its work without him." [Dkt. No. 18-8 at 9]. Furthermore, Defendant submits that in April 2018, a month after Plaintiff's termination, an existing employee assumed Plaintiff's duties, in addition to his own role, upon his return from a medical leave. (¶ 101). Plaintiff provides no evidence to the contrary, in fact, he does not argue that NVR sought anyone to fill his position after it terminated his employment. Instead, Plaintiff concludes that he has "clearly" established element four, arguing that the employment decision took place under the circumstances that give rise to an inference of unlawful discrimination. The

only evidence proffered by Plaintiff to support an inference of discrimination, is that he was fired one month after he was injured. [Dkt. No. 22 at 15-16].

While "there is no single prima facie case that applies to all discrimination claims," Plaintiff provides no support in asserting what the fourth element of discriminatory discharge claim requires. In fact, the case cited by Plaintiff explicitly provides that: "If the claim is based upon discriminatory discharge, . . . plaintiff must demonstrate: (4) that the employer thereafter sought similarly qualified individuals for that job." Victor v. State, 203 N.J. 383, 409, 4 A.3d 126, 141 (2010). Furthermore, Plaintiff fails to show that temporal proximity, alone, establishes the fourth element of prima facie case for disability discrimination by creating any inference of discrimination.

"Therefore, even giving Plaintiff every reasonable inference, Plaintiff is unable to establish the fourth element of a prima facie case of discrimination under the NJLAD." O'Hare v. McLean Packaging & Trucking, No. CIV.A. 08-2083, 2009 WL 3207277, at *12 (D.N.J. Sept. 29, 2009) (granting summary judgment where no one was hired to fill the plaintiff's position, rather an employee assumed the plaintiff's duties in consolidation with his other responsibilities).

2. *Pretext*

Even assuming arguendo that Plaintiff has established a prima facie case for disability discrimination, Plaintiff's NJLAD discrimination claim fails because he cannot show a genuine factual dispute exists as to whether Defendant's legitimate non-discriminatory reason for his termination was pretext. The parties here agree that Defendant has articulated a legitimate non-discriminatory reason for its termination of Plaintiff's employment. Specifically, Defendant provides that it terminated Plaintiff for

his poor performance evaluations throughout his tenure with NVR. [Dkt. No. 18-5 at 10]. Plaintiff submits that this proffered reason is pretextual and that his injuries were more likely than not the cause of his termination. Plaintiff argues that a reasonable juror could find Defendant's reason for termination was false because: (1) his performance reviews were subjective and biased; (2) his performance reviews were unclear; and (3) there was a short period of time between his injuries and termination.

First, Plaintiff submits that his performance evaluations were biased because they were written by his supervisors who "rolled eyes" at Plaintiff's limitations and tried to investigate him on Facebook so that they could terminate him for his injury.[3] [Dkt. No. 22 at 18]. These performance evaluations were completed by Bachman, Plaintiff's direct supervisor. [Dkt. No. 18-4 ¶ 13]. With regard to eye rolling, the record provides that a few days after returning to work from his surgery, Bachman asked Plaintiff to go to "war walls," which was "very demanding." When Plaintiff told Bachman that his doctor said he should take it easy, Bachman rolled his eyes. (Pl. Dep. at 84:23-86:6). At this time, however, it is undisputed that Plaintiff's doctor returned him to work with no restrictions. (Id. at 226:23-25; 226). This single event fails to show that Plaintiff's performance reviews were subjective, as to produce any inference of discrimination.

The only other instance of "eye rolling" involved Tom Green. In a light most favorable to Plaintiff, the record shows that, while Plaintiff was on light duty, Green asked him why he was lifting a box of nails and specifically stated "is that in your weight restriction?" (Pl. Dep. 159-160:15-21). Plaintiff responded to Green by stating:

> you are asking about the weight restriction now, but yet I am still pushing and pulling my cart that weighs more than these nails, plus pushing the

---

[3] The Court notes that Plaintiff provides no citation to the record or his own statement of facts to support these actions by his superiors in his brief.

bundles around on the wheels that weigh a lot more than these nails, and
then [Green] just smirked at me, rolled his eyes and walked away.

(Id. at 159:10-18).

Green is also the individual who, according to Plaintiff, "investigated" him on
Facebook. (Green Dep. 48:6-17). Following Plaintiff's hernia injury in February 2018,
Green decided to look into Plaintiff's Facebook profile. (Id.) Green testified: "It's pretty
common in this day and age that people have gotten themselves into some hot water
based on what they put on social media and I was wondering if that was the case . . . get
themselves into hot water based on what they post on social media." (Id. at 49:1-8).
Green further stated that there "are occasions that we have to be sensitive to if someone
is falsely reporting claims." (Id. at 49:8-20).

Green looked through Plaintiff's pictures and ultimately, found a photo of the
plaintiff lifting weights from 2016. He forwarded this photo to Harris. Both Green and
Harris acknowledged that the picture was not connected to the time frame of his work
injury, and that the photo "essentially meant nothing." (Id. at 50:21-51:1; Harris Dep. at
51:8-13). Plaintiff, however, suggests that Green was searching for something so NVR
could terminate him, but provides no evidence that his investigation was for
discriminatory reasons rather than reasons related to his role with NVR. Green's job
responsibilities includes acting as a workers' compensation liaison for employees, like
Plaintiff, who are injured on the job. [Dkt. No. 18-4 ¶ 4]. Employees are supposed to
report non-emergency injuries to him or someone else in a safety role. When an
employee gets injured, there is an "investigation of what's been reported." (Harris Dep.
24:15-20). "Part of the investigation is to figure out exactly what happened. . . so you can

prevent it again." (Id. at 52:11-25);[4] see Hancox v. Lockheed Martin Tech. Servs., No. CIV. 04-6104, 2007 WL 1796248, at *8 (D.N.J. June 21, 2007) (Plaintiff's opinion that employer's investigation into complaint's about Plaintiff was "bogus" or "botched" and a "farce," "without supporting evidence, does not rebut . . . stated reasons for terminating [Plaintiff].").

Plaintiff also fails to provide evidence that Green's investigation lead to subjective performance reviews. In fact, Tom Green was not responsible for Plaintiff's performance reviews, and he alone initiated the Facebook search. Furthermore, the argument that Green's supposed discriminatory bias against Plaintiff caused his termination is also unsupported by the record because Bachman proposed Plaintiff's termination. There is no evidence that Green was the "key decision-maker." Shann v. Atl. Health Sys., No. CV124822, 2017 WL 5260780, at *13 (D.N.J. Nov. 13, 2017). Thus, Plaintiff's "evidence fails to cast sufficient doubt upon [Defendant's] reasons for terminating him. Id. at *10.

Next, Plaintiff argues that his performance reviews were unclear. More specifically, Plaintiff submits "the performance reviews reflected very little time worked in which Plaintiff was not injured. . . . [and] are also unclear as to which comments and ratings reflect Plaintiff's own performance and which reflect the performance of the team as a whole, the other members of which were not terminated." [Dkt. No. 22 at 18]. This argument also falls short of showing pretext.

As previously stated, Plaintiff's first review, prior to any injuries or accommodations, was "marginal." His 60-day review was "good", though his numerical

---

[4] This testimony was in response to the following question posed at Harris' deposition: "is that part of the typical investigation whether someone is either faking it or has had a similar injury before[,]" to which Harris further stated: "so, yes." (Id.).

rating only improved from 6.86 to 7. His weekly reviews prior to any injury, from his start date through May 1, 2017, exhibited Plaintiff was, on average, "marginal" in all categories except "quality." Plaintiff's numerical ratings applied directly to him (Bachman Dep. 52:16-24), and he did not dispute any of these numerical performance ratings with NVR while employed. [Dkt. No. 18-4 ¶ 53].

While some comments were applicable to Plaintiff's team as a whole, Bachman testified to which comments applied to the Plaintiff individually. Those comments — "still having issues getting back to position after break," and "lots of inactivity/talking at back of line. Coming back late from breaks,"—largely mirror Plaintiff's later review comments, which were made while Plaintiff was working light or modified duty. [Dkt. No. 22-8, Ex. G; Dkt. No. 18-4 ¶ 48; Dkt. No. 18-3, Ex. P].

Plaintiff's reviews following his injury began with his six-month review. This review was given to Plaintiff following his return from medical leave and rated him "unacceptable." [Dkt. No. 18-4 ¶ 48]. Plaintiff was subsequently coached on where he needed to improve. During the coaching, Bachman told Plaintiff to focus on Banding. Bachman testified that "even before he got hurt that was what we were trying to get him to do as his primary job was just focus on banding the packs and letting the lead guys do the rest of the work." Plaintiff's reviews following his performance coaching fluctuated. He improved in job knowledge, but his teamwork, safety and work pace scores were low. [Dkt. No. 18-3, Ex. Q].

"[A]t the pretext stage it is not a court's role to rule on the strength of cause for discharge. The question is not whether the employer made the best, or even sound, business decision; it is whether the real reason is discrimination." Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 647 (3d. Cir. 2015). Here, Plaintiff

testified:

> What I was told from my evaluations, it looks like, I am sorry, I sucked, from what it looks like. I was marginal every time. Which I didn't understand . . . How does my performance add up to marginal when I have the most signatures and the most trailers pushed out? Per them, that's my job, to get the trailers out.

(Pl. Dep. 125:1-15). Plaintiff also explained that certain negative comments after he returned from his knee surgery were based on his injuries. For example, the week of January 22, 2018, Bachman noted that Plaintiff was limited in what he was willing and able to do. Plaintiff claims that Bachman did not like him "after he got hurt and was "biased to [his] injuries." (Pl. Dep. at 225:22-226:22). Plaintiff stated Bachman "wasn't allowing [him] to get back into the flow with these comments." (Id.) He explained that after only six days back, he had to re-learn things in the pit and start "back slowly." (Id.). But at the time, Plaintiff had no injury or restrictions. (Id. at 226:18-25).

Defendant further argues that "[Plaintiff also] attributes his poor ratings to non-discriminatory factors." [Dkt. No. 18-5 at 11]. Notably, Plaintiff testified that his employee performance ratings were low because: "it seemed like a popularity contest. I know the leader from panels on line 1 and 2 [simply] didn't like me at all." (Id. at 224:21-25). When asked aside from his two injuries, "were there any other events that led NVR to treat you in a discriminatory or unfair way?" (Pl. Dep. 87:11-17). Plaintiff testified: "Mike would come up to me like you need to speed up, speed up a little bit, but yet I just learned that job two days ago I was doing safety first over speed . . . every week, he would have me do a different – learn a new trade of the panel wise." (Id. at 87:18-88:20). Plaintiff further explained: it wasn't like a consistency to where I could get quick enough to learn and get better at the trade." (Id. at 87:18-88:20).

Thus, while plaintiff attributes low performance evaluations to discriminatory animus, he does not deny his performance problems and justifies them based on additional factors outside of his injury. See Zive, 867 A.2d at 1144 ("[A]lthough a plaintiff's acknowledgment of performance deficiencies does not factor into the second prong of the prima facie case, it will generally lighten the employer's burden on the second phase and render more difficult plaintiff's ability to prove pretext."). Moreover, Plaintiff's testimony, in essence, demonstrates some consistencies in his overall performance evaluations, rather than inconsistencies.

With regard to the timing of Plaintiff's termination, "temporal proximity may be sufficient to show pretext '[i]n certain narrow circumstances' based on the particular facts and stage of a case." Proudfoot v. Arnold Logistics, LLC, No. 14-4703, 2015 WL 5881530 (3d Cir. Oct. 8, 2015) (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir.2007)). Here there was approximately three-weeks between Plaintiff's second injury and his termination. In light of the other evidence presented, this timing alone is insufficient to show Defendant's proffered reason for termination is pretext. Plaintiff was coached on his performance issues following an "unacceptable" performance review prior to his second injury. That review mainly concerned Plaintiff's job performance before his first injury and prior to his medical leave. Plaintiff was then terminated after his next, and second consecutive, "unacceptable" review.

To reiterate, "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F. 3d at 765. Aside from his own testimony, Plaintiff has no

evidence of discriminatory animus.[5] The Court finds that Plaintiff fails to establish pretext, and therefore, will grant summary judgment on Count I in Defendant's favor.

### B. Count Two: Failure to Provide Reasonable Accommodation

In Count two, Plaintiff alleges that he requested reasonable accommodation from NVR, to allow him to perform his position with modified duty, but that Defendant denied this accommodation by feigning compliance and then subsequently terminating him. (Compl. ¶ 30). An employer "must make a reasonable accommodation to the limitations of an employee or applicant who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship." N.J. Admin. Code tit. 13, § 13–2.5. This duty to accommodate, however, is subject to an exception, "where it can reasonably be determined that an . . . employee, as a result of the individual disability, cannot presently perform the job even with reasonable accommodation." Id. at § 13–2.8(a).

To make out a prima facie failure to accommodate claim under the NJLAD, Plaintiff must show that: (1) he was disabled or perceived to have a disability; (2) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation[6] by the employer; (3) he suffered an adverse employment

---

[5] Defendant's also point out that it is undisputed that Plaintiff cannot present any employee who received lower overall ratings at NVR than he did, nor does he provide any comparators-employees outside of his protected class who were treated more favorably.

[6] Reasonable accommodations may "include job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities." Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 248 (3d Cir. 2006) (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 319 (3d Cir. 1999)).

action because of the disability. <u>Victor v. State</u>, 952 A.2d 493, 503 (N.J. Super. Ct. App. Div. 2008), <u>aff'd as modified</u>, 4 A.3d 126 (N.J. 2010).

When an employee requests accommodation, the employer has a duty to engage in an interactive process in an effort to assist the employee. <u>Jones v. United Parcel Svc.</u>, 214 F.3d 402, 408 (3d Cir. 2000). To show that an employer failed to participate in the interactive process, "the employee must show the employer was informed of the disability, the employee requested accommodation, the employer made no good faith effort to assist, and the accommodation could have been reasonably achieved" but for the employer's lack of good faith. <u>Victor</u>, 952 A.2d at 504 (citing <u>Tynan v. Vicinage 13 of the Superior Court</u>, 798 A.2d 648, 657 (N.J. Super. Ct. App. Div. 2002)). "Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome." <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 317 (3d Cir. 1999).

Here, Defendant argues Plaintiff cannot demonstrate that NVR failed to participate in the interactive process because (1) NVR fully accommodated Plaintiff's restrictions; (2) and extended every accommodation to Plaintiff that he requested. The Court agrees.

The undisputed facts establish that Plaintiff provided Defendant with his temporary medical restrictions, following both of his injuries, for which he requested modified duty. (Compl. ¶ 30; Dkt. No. 22-2 ¶ 18; Dkt. No. 18-4 ¶ 65). First, after Plaintiff's initial knee injury, he was placed on modified duty as requested. [Dkt. No. 22-

2 ¶ 18]. His medical restrictions included: "Wear Splint/Brace RLE - constantly - up to 8 hrs or greater per day"; "May not walk on uneven terrain"; "No climbing stairs"; "No climbing ladders"; but Plaintiff was cleared to work his entire shift[.]" [Dkt. No. 18-4 ¶ 36]. His team was put on notice of his restrictions and instructed to assist Plaintiff with job tasks if he was unable to perform those tasks. (Id. at ¶¶ 41, 100). He was also told that he no longer had to climb and could avoid using the ladder into the truck bay by taking the ramp. NVR later afforded him six months leave for his knee surgery in July 2017. (Id. at 40).

In February 2017, Plaintiff experienced a second work-related injury, a hernia, for which he returned to work with new restrictions. [Dkt. No. 18-4 ¶¶ 64-65]. Those restrictions included: "May lift up to 10 pounds occasionally up to three hours a day, may push or pull up to 10 pounds occasionally up to three hours a day, and patient is able to work their entire shift." [Dkt. No. 18-4 ¶¶ 64-65]. Plaintiff again informed his supervisor of such restrictions. Subsequently, Plaintiff's duties were again modified. This time Plaintiff was placed on light duty, only performing banding duties, which required strapping stacks of walls together with nylon straps using a ratchet tensioner. (Id. at ¶ 25). In addition, Plaintiff's team was instructed to help him with tasks he was unable perform due to any new restrictions. (Id. at ¶ 68)

Although Plaintiff testified that he could not perform, or assumed he was unable to perform, his light duty job within his restrictions, it is undisputed that Plaintiff did not inform Defendant that any of his accommodations were outside of his restrictions or otherwise insufficient.[7] (Id. at ¶ 72); Notably, Plaintiff does not argue that the Defendant

---

[7] To the extent it is Plaintiff's position that his accommodations were not reasonable because he was forced to violate his restrictions, his claim similarly fails. First, Plaintiff provides no

failed to provide accommodations or that its accommodations were inadequate. In opposition, Plaintiff concludes that there exists a genuine issues of fact as to the reasonableness of NVR's accommodation process to preclude summary judgment. In that regard, Plaintiff submits that a reasonable jury could find that Defendant did not act in good faith during the interactive process as it failed to adequately assist the Plaintiff after his second injury by "putting him in a light duty position in which he could not perform well, writing him up for said performance, and then terminating him."[8] In other words, Plaintiff argues that Defendant pretended to accommodate him, setting him up for termination.

Plaintiff provides no evidence that Defendant did not act in good faith during the interactive process. Indeed, Plaintiff's argument is one of mere speculation, which

---

evidence that his accommodations were outside of his restrictions. Defendant's expert provides, however, evidence that each of Plaintiff's duties on light duty was within his medical restrictions. Plaintiff's lay opinion and admitted "assumptions" do not rebut such evidence. Plaintiff seeks to have this Court disregard Defendant's expert report. However, the report is properly before the Court. Defendant served Mr. Zavitz's report on Plaintiff, and Plaintiff admittedly could have requested to depose the expert. Defendant also supplemented the expert report with sworn declaration. Additionally, the expert's opinions are not "net opinions" but rather based on data, observations, and measurements. (Zavitz Report, at pp. 1-8); see also Holman Enterprises v. Fid. & Guar. Ins. Co., 563 F. Supp. 2d 467, 472 (D.N.J. 2008) ("[T]he net opinion rule is merely a restatement of the well-settled principle that an expert's bare conclusions are not admissible under [the fit requirement of] Rule 702 of the Federal Rules of Evidence." (citation omitted)). Even if the Court were to strike the report, Plaintiff's "failure to show that he complained of any of his light duty assignments [is] fatal to his claims." McGlone v. Philadelphia Gas Works, 733 F. App'x 606, 611 (3d Cir. 2018). Plaintiff, by his own admission, testified that he could not perform his job within his restrictions. He testified that he could not perform any job with his restrictions resulting from his hernia. Therefore, Plaintiff cannot subsequently claim, or show, that any additional or other accommodation could have been reasonably achieved.

[8] Rather than providing any legal support for this contention, Plaintiff baldly cites to two different New Jersey District Court cases, which addressed claims for failure to accommodate on motions to dismiss, prior to discovery. These cases are unlike Plaintiff's, where the "full picture" of the facts have emerged. Additionally, Plaintiff does not show or suggest that the allegations in Leshner v. McCollister's Transp. Sys., 113 F. Supp. 2d 689, 693 (D.N.J. 2000) and McQuillan v. Petco Animal Supplies Stores, Inc., 2014 U.S. Dist. LEXIS 58464, 20-21 (D.N.J. Apr. 28, 2014) are similar to those presented here.

without more, fails to produce genuine issues of material fact for trial. The record here provides that Plaintiff did not inform or complain to his employer that he could not perform well in light duty, a modification that Plaintiff agreed to. (Pl. Dep. 62:15-18, 150:13-151:3; Green Dep. 46:13-47:8, 93:23-25, 96:6-15; Bachman Dep. 36:22-37:23). "[A]n employer cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs . . ." Taylor, 184 F.3d at 317.

Additionally, NVR's duty to accommodate Plaintiff "extends only so far as necessary to allow a disabled employee to perform the essential functions of his job. It does not require acquiescence to the employee's every demand." Rich v. State, 294 F. Supp. 3d 266, 279 (D.N.J. 2018) (citation omitted); see also Grant v. Revera Inc./Revera Health Sys., No. CIV.A. 12-5857, 2014 WL 7341198, at *12 (D.N.J. Dec. 23, 2014) ("To the extent Plaintiff desired accommodation for limitations in excess of those sets forth on Plaintiff's undisputed medical documentation, the duty to submit such additional documentation rested solely with Plaintiff.").

Accordingly, viewing the facts in the light most favorable to Plaintiff, he fails to show a lack of good faith by Defendants. Indeed, Plaintiff's counsel made clear at oral argument that Plaintiff disputes the legitimacy of his evaluations while he was working within his existing accommodations, not the sufficiency of the accommodations themselves. "All the interactive process requires[, however,] is that employers make a good-faith effort to seek accommodations." Taylor, 184 F.3d at 317. Without evidence showing that Defendant failed to do so here, Plaintiff fails to demonstrate as a matter of law that Defendant violated the NJLAD for failure to accommodate his disability. Thus, the Court will grant summary judgment in favor of Defendant on Count two.

### C. Count Three: Wrongful Termination

Count Three alleges that Defendant terminated Plaintiff in retaliation for filing for workers' compensation benefits in violation of public policy. (Compl. ¶¶ 41-47). "In order to establish a prima facie case for retaliatory discharge, the employee must prove that: (1) he or she attempted to make a claim for workers' compensation benefits; and (2) he or she was discharged for making that claim. Morris v. Siemens Components, Inc., 928 F. Supp. 486, 493 (D.N.J. 1996) (citing Lally v. Copygraphics, 173 N.J. Super. 162, 179 (App. Div. 1980), aff'd, 85 N.J. 668 (1981)).

In this case, the parties do not dispute that, Plaintiff made a workers' compensation claim. Plaintiff made two claims, one for both of his work-injuries. However, Defendant submits that Plaintiff fails to establish causation between his workers' compensation claim and his termination. [Dkt. No. 18-5 at 19]. In particular Defendant suggests that Plaintiff's only means of establishing causation is the temporal proximity between his second workers' compensation claim, and his termination.

According to the record, Plaintiff's termination was effective March 14, 2018, which was approximately three weeks after his February 21st hernia, for which he filed a worker's compensation claim the next day. As the Court discussed above, it is settled law in this circuit that timing alone will generally not create an inference of retaliation. See Quiroga v. Hasbro, Inc., 934 F.2d 497, 501 (3d Cir. 1991); see also Morris v. Siemens Components, Inc., 928 F. Supp. 486, 493 (D.N.J. 1996) ("Although the timing of a discharge may be significant, it, alone, cannot raise an inference of causation sufficient to establish a prima facie case of retaliation."). "Even if timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be

inferred," <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 503 (3d Cir. 1997), and here, without more, approximately three weeks is not unusually suggestive. <u>Thomas v. Town of Hammonton</u>, 351 F.3d 108, 114 (3d Cir. 2003) ("In cases such as this one where the temporal proximity [i.e., three weeks] is not so close as to be unduly suggestive, we have recognized that timing plus other evidence may be an appropriate test.").

In response, Plaintiff contends that his "termination was triggered by workplace injury," and merely asserts "there exists a sufficient causal nexus between the workers' compensation claim, NVR's refusal to properly engage in the interactive process, and the ultimate termination of Mr. Rooney' employment. The strength of the causal nexus is a question for the fact-finder as a reasonable jury could conclude that the Plaintiff's second workers' compensation claim in one year was a motivating factor for his ultimate termination." [Dkt. No. 22 at 23]. Plaintiff comes to this conclusion without identifying any evidence from the record or legal support. Furthermore, Plaintiff does not rebut Defendant's argument as to why no causation exists.

Importantly, Plaintiff, as the non-moving party, must identify specific facts and affirmative evidence that contradict those offered by the moving party, to withstand a properly supported motion for summary judgment. <u>Andersen</u>, 477 U.S. at 256–57. Therefore, Plaintiff's conclusory argument fails to make out a <u>prima facie</u> case for retaliatory discharge. The Court will grant the Defendant's Motion for Summary Judgment as to Count Three of Plaintiff's Complaint.

IV.     Conclusion

For the forgoing reasons, the Court will grant Defendant's Motion for Summary Judgment [Dkt. No. 18], and will grant in part and deny in part Defendant's Motion to Strike Plaintiff's Response to Defendant's Statement of Facts and Plaintiff's Statement of Facts [Dkt. No. 25].

An appropriate Order shall issue.

Dated: April 13, 2020


    /s/     Joseph H. Rodriguez
Hon. Joseph H. Rodriguez,
UNITED STATES DISTRICT JUDGE